## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 31 2018, 9:09 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Daniel G. Foote
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Frances Barrow
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of:

D.U.H. and E.U. *(Minor Children)*
and
P.U.R. *(Father)*,
*Appellant-Respondent,*

v.

The Indiana Department of Child Services,
*Appellee-Petitioner,*

and

Child Advocates, Inc.,
*Appellee-Guardian Ad Litem.*

October 31, 2018

Court of Appeals Case No.
18A-JT-1348

Appeal from the Marion Superior Court

The Honorable Gary Chavers, Judge Pro Tem

The Honorable Larry Bradley, Magistrate

Trial Court Cause No.
49D09-1710-JT-913
49D09-1710-JT-911

**Robb, Judge.**

# Case Summary and Issues

P.U.R. ("Father") appeals the juvenile court's termination of his parental rights to D.U.H. and E.U. (collectively, the "Children"), raising three issues which we consolidate and restate as two: (1) whether the juvenile court's termination order is supported by clear and convincing evidence and (2) whether Father was denied a fair hearing. Concluding the termination order is not clearly erroneous and the hearing was not unfair, we affirm.

# Facts and Procedural History

Father and M.H. ("Mother") are the parents of the Children, who were born on July 13, 2011, and December 29, 2013.[1] In February 2016, while the Children were residing with Mother, Father witnessed Mother smoking methamphetamine from a pipe as he returned the Children to her home. The next day, Father returned to Mother's home and recorded her smoking methamphetamine while the Children were elsewhere in the home. Father then reported these incidents to the Indiana Department of Child Services ("DCS").

---

[1] Mother's parental rights were also terminated but she does not participate in this appeal. Accordingly, we limit our recitation of the facts to those applicable to Father.

The Children were taken into custody without a court order on February 21, 2016.

[3] On February 23, 2016, DCS filed a petition alleging the Children were children in need of services ("CHINS") because of the parents' inability to provide Children "with a safe, stable, and appropriate living environment free from substance abuse." Exhibits, Volume I at 18. DCS alleged that despite being offered services in the past, Mother continued to use methamphetamine and her whereabouts were currently unknown and further alleged that Father was unable to ensure the Children's safety and well-being while in the care of Mother. At the conclusion of the initial hearing, the juvenile court ordered Children removed from Mother's care and placed with Father.

[4] At a fact-finding hearing on June 8, Father admitted the Children were CHINS. The juvenile court entered a dispositional order on July 20, which placed the Children in a temporary trial home visit with Father, who was ordered to engage in home-based case management and to submit to random drug and alcohol screening. However, on September 30, the guardian ad litem expressed concerns with Father's ability to care for the Children because he was not cooperative with DCS, the guardian ad litem, or providers, and he refused to allow service providers to access his home. Thereafter, the juvenile court ended the temporary trial visit and ordered the Children removed from Father's care due to alleged educational and therapeutic neglect, as well as Father's positive drug test.

[5] At a modification hearing on October 26, the Children's therapist stated that Father exhibited concerning and aggressive behavior during visits with the Children. On November 9, the juvenile court conducted a periodic review hearing and DCS presented evidence that Father twice tested positive for illicit substances, had been aggressive toward the foster parents and visitation supervisor, was at times combative, and that the Children were traumatized after Father's parenting time sessions. D.U.H. had begun engaging in self-harming behavior and both Children began to wet their beds. The juvenile court ordered Father's parenting time be therapeutically supervised and modified Father's disposition to include anger management, substance abuse treatment, and home-based therapy.

[6] By the time of a permanency hearing on February 8, 2017, Father had been incarcerated on drug charges and placed on an immigration hold. DCS presented evidence that Father had screened positive for marijuana and refused screening for an additional two week period. Father's home-based therapist testified that Father had broken the rules of visitation by bringing his cell phone and hiding candy in the Children's boots. The therapist also stated that, during the most recent visit, Father grabbed D.U.H. in a "dangerous way by her head" when playing and that Father laughed when the Children were upset. *Id*. at 100.

[7] DCS filed a petition to terminate parental rights on October 5, 2017, and the juvenile court conducted a termination hearing on April 5 and 24, 2018. Father was not present at the hearing because he had been deported to the Dominican

Republic. Father was, however, provided counsel, an interpreter, and was allowed to listen to, and participate in, the hearing via telephone. On May 9, 2018, the juvenile court issued its order terminating Father's parental rights, finding and concluding the following:

2.     Child in Need of Services Petitions "CHINS" were filed on [Children] on February 23, 2016, . . . on allegations that [Mother] used methamphetamine and her whereabouts was unknown. Allegations against [Father] was [sic] that he was unable to ensure the safety of the children while in their [M]other's care.

3.     The CHINS Petitions also included allegations that the parents had an extensive history with [DCS]. They were involved in a CHINS case in 2014, and two cases to compel their behavior in 2015.

4.     The [C]hildren were placed with their [F]ather at the February 23, 2016, initial hearing. However, on September 30, 2016, they were ordered detained and placed outside the home due to educational and therapeutic neglect, and [Father] testing positive for THC. The [C]hildren have remained out of home.

5.     The [C]hildren were found to be in need of services as to their [F]ather on June 8, 2016, and as to their [M]other on June 29, 2016.

* * *

16.     [Father] was ordered to engage in case management and random drug screens. His disposition was modified when he tested positive for THC, and he was also required to

undergo a substance abuse assessment and follow recommendations, engage in therapy, and complete anger management.

17. [Father] did a domestic violence assessment which recommended a twenty-six week batterers intervention program. [Father] completed three sessions.

18. [Father] minimized his role in domestic violence, and blamed the system and past partners. He has exhibited his anger and aggression at child and family team meetings [sic] and during parenting time.

19. Providers observed [Father's] behavior as combative, aggressive, and threatening.

20. [Father] did not make progress in his approximate fifteen sessions of home based therapy to address anger, coping skills, and parenting skills do [sic] to his venting during therapy sessions.

21. [Father] was mainly consistent in parenting time between October of 2016 until early 2017, although he would be significantly late. He has not seen the [C]hildren since being deported, well over one year ago.

22. [Father's] visitation supervisor did not think he appeared to have the capacity to parent and had concerns whether the [C]hildren would be supervised with him. He relinquished [E.U.] to his paramour to take care of on every visit, and treated [D.U.H.] inappropriately for her age and sex. His mannerisms and language were inappropriate. Other concerns included [Father] not

assuming a parenting role, lack of discipline, and not following rules.

23. [Father] was incarcerated on drug charges and he contacted [DCS] in August of 2017 to inform the family case manager that he had been deported to the Dominican Republic due to being in the United States illegally.

24. Although the CHINS cases have been pending for over two years, and this termination action has been pending for over six months, [Father] testified he was still planning to start services to address his aggression the Saturday after trial in this matter.

25. On September 6, 2017, the plan for the [C]hildren's permanency was changed from reunification to adoption, with the Court finding, in-part, that before being deported, [Father] was inconsistent with services, was uncooperative with the [DCS], and when he screened, he tested positive for THC, and [Father] was aggressive during parenting time with the [C]hildren being traumatized. The Court further found that [Mother] was in agreement with the permanency plan changing to adoption.

26. The [C]hildren have been placed in the care of their paternal great-aunt. The [C]hildren's grandmother also resides in the home. This placement is preadoptive.

27. The [C]hildren have suffered trauma, have had many residential moves, and have behavioral issues which are getting better.

28. The [C]hildren's therapist believes the stability of their placement is a positive for the [C]hildren, and it was

traumatic for the [C]hildren when they moved. The therapist believes that stability and permanency would greatly benefit the [C]hildren, and that they are in need of a forever home sooner than later.

29. The great-aunt is committed to providing a structured home for the [C]hildren and is working on parenting skills to address the [C]hildren's special needs.

* * *

31. There is a reasonable probability that the conditions that resulted in the [C]hildren's removal and continued placement outside the home will not be remedied by their [F]ather. From his demeanor and history, [Father] would need therapy and anger management as well as domestic violence classes to make sure a cycle of violence does not take place. From his actions at parenting time sessions and the neglect alleged when the [C]hildren were detained, he would not be an appropriate parent without parenting education. Substance abuse is still a concern and would need addressed. Considering [Father's] defiant mindset, these many conditions would not be remedied if he is given more time.

32. There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the children's well-being. Without addressing substance abuse, instability, lack of parenting skills, anger, parents cannot provide a safe and stable environment or meet the [C]hildren's needs. More importantly, these [C]hildren are in need of permanency at this time and another move for the [C]hildren could be devastating.

33. Wendy Claxton has been the [C]hildren's Guardian ad Litem for two years. Based on the length of time the CHINS case has been pending, the lack of parents' progress, Ms. Claxton agrees with adoption being the permanency plan in the [C]hildren's best interests. She believes that it would not be in the [C]hildren's best interests to give the parents additional time.

34. Termination of the parent-child relationship is in the best interests of the [C]hildren. Termination would allow them to be adopted into a stable and permanent home where their needs will be safely met.

35. There exists a satisfactory plan for the future care and treatment of the [C]hildren, that being adoption.

Appellant's Appendix, Volume II at 24-26. Father now appeals.

# Discussion and Decision

[8] A parent's interest in the care, custody, and control of their children is "perhaps the oldest of the fundamental liberty interests[,]" *Bester v. Lake Cty. OFC*, 839 N.E.2d 143, 147 (Ind. 2005), and these rights are protected by the Fourteenth Amendment to the United States Constitution, *In re D.D.*, 804 N.E.2d 258, 264 (Ind. Ct. App. 2004), *trans. denied*. These rights are not without limitation, however, as the law provides for the termination of the parent-child relationship when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008).

# I. Standard of Review

When reviewing the termination of parental rights, we do not reweigh the evidence or judge the credibility of witnesses. *In re D.D.*, 804 N.E.2d at 265. We only consider the evidence and reasonable inferences therefrom most favorable to the judgment. *Id.* And we only set aside a juvenile court's judgment terminating a parent-child relationship when it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied, cert. denied*, 534 U.S. 1161 (2002). A judgment is "clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *Bester*, 839 N.E.2d at 147.

As required by statute, the juvenile court entered findings of fact and conclusions thereon when terminating Father's parental rights. Ind. Code § 31-35-2-8 (providing "if the court finds the allegations in a petition . . . are true, the court shall terminate the parent-child relationship" and "shall enter findings of fact that support the entry of the conclusions"). Accordingly, we apply a two-tiered standard of review. *Bester*, 839 N.E.2d at 147. We must first determine whether the evidence supports the findings; then we determine whether the findings support the judgment. *Id.* Findings will only be set aside if they are clearly erroneous and findings are clearly erroneous only "when the record contains no facts to support them either directly or by inference." *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997).

# II. Termination of Parental Rights

To terminate parental rights, Indiana Code section 31-35-2-4(b)(2) requires the State to prove, in relevant part:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> * * *
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

The State must prove the foregoing elements by clear and convincing evidence. Ind. Code § 31-37-14-2; *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016). However, "[b]ecause subsection (b)(2)(B) is written in the disjunctive, . . . the [juvenile] court need only find one of the two elements by clear and convincing evidence." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 373 (Ind. Ct. App. 2006) (citation omitted), *trans. denied*.

Here, the juvenile court found that the State proved all of the statutory elements by clear and convincing evidence. Father now challenges the sufficiency of the evidence to support each finding.

## A. Remedy of Conditions

Father first contends the State failed to prove by clear and convincing evidence the conditions resulting in Children's removal will not be remedied. The juvenile court concluded:

> There is a reasonable probability that the conditions that resulted in the [C]hildren's removal and continued placement outside the home will not be remedied by their [F]ather. From his demeanor and history, [Father] would need therapy and anger management as well as domestic violence classes to make sure a cycle of violence does not take place. From his actions at parenting time sessions and the neglect alleged when the [C]hildren were detained, he would not be an appropriate parent without parenting education. Substance abuse is still a concern and would need addressed. Considering [Father's] defiant mindset, these many conditions would not be remedied if he is given more time.

Appellant's App., Vol. II at 26, ¶ 31.

In determining whether the conditions that resulted in the children's removal will not be remedied, we engage in a two-step analysis:

> First, we identify the conditions that led to removal; and second, we determine whether there is a reasonable probability that those conditions will not be remedied. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of

changed conditions—balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior.

*In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (citations, quotations, and footnote omitted).

[16] Here, the Children were initially removed from their parents due to their inability to provide Children "with a safe, stable, and appropriate living environment free from substance abuse." Exhibits, Vol. I at 18. As it pertains to Father, DCS alleged he was unable to ensure the Children's safety and well-being while in their Mother's care. DCS also alleged that both parents had an extensive history with DCS and were offered services through previous CHINS actions. Children were placed with Father on a temporary trial visit but removed from Father's care "due to educational and therapeutic neglect, and [Father] testing positive for THC." Appellant's App., Vol. II at 24, ¶ 4. When balancing the conditions that led the Children's removal against Father's recent improvements, we cannot conclude the juvenile court judgment was clearly erroneous for three primary concerns.

[17] First and foremost, Father has failed to adequately address his anger, aggression, and propensity for domestic violence. After Father completed a

domestic violence assessment, it was recommended that he complete a twenty-six-week batterers intervention program of which he only completed only three weeks. Father routinely displayed disturbing behavior during parenting time, which traumatized the Children. Notably, the juvenile court found Father's potential to remedy this condition is particularly unlikely given his "defiant mindset," *id*. at 26, ¶ 31, and how Father has "minimized his role in domestic violence, and blamed the system and past partners." *Id.* at 25, ¶ 18.

[18] Second, Father's significant history of substance abuse shows no sign of improvement. During the CHINS case, Father tested positive for illicit substances and, at other times, refused drug screens entirely. Father missed the permanency hearing due to his incarceration on drug possession charges[2] and the record is otherwise absent of any significant effort on Father's part to effectively deal with his substance abuse issues.

[19] Third and finally, Father's capacity to parent has shown no signs of improvement. Father did not make progress in home-based therapy sessions due to "his venting during therapy sessions." Appellant's App., Vol. II at 25, ¶ 20. And during visitation sessions, Father routinely relinquished the Children to others, behaved inappropriately, and failed to assume a parenting rule.

---

[2] Father testified at the termination hearing that he had never been convicted of a crime but had been arrested "several times" and "beat both cases[.]" Transcript, Volume II at 133.

On appeal, Father complains that DCS terminated its efforts when he was deported through no fault of his own. However, it is well established that:

> the law concerning termination of parental rights does not require [DCS] to offer services to the parent to correct the deficiencies in childcare . . . . Rather, while a participation plan serves as a useful tool in assisting parents in meeting their obligations, and while [DCS] routinely offer[s] services to assist parents in regaining custody of their children, termination of parental rights may occur independently of them, as long as the elements of Ind. Code § 31-35-2-4 are proven by clear and convincing evidence.

*In re B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000) (citations omitted); *see also In re E.E.,* 736 N.E.2d 791, 796 (Ind. Ct. App. 2000) ("A failure to provide services, or the provision of services in an allegedly discriminatory manner, does not serve as a basis on which to directly attack a termination order as contrary to law."). In any event, Father's response to services has been *minimal* at best. During the two-years of the underlying CHINS action, Father failed to take substantial steps at self-improvement, failing to avail himself of some services while failing to complete others. We therefore conclude allowing time for additional services would likely be fruitless and that Father's argument on this issue is unconvincing. *See Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007) (noting that a court may consider a parent's response, or lack thereof, to services offered the parent), *trans. denied*; *In re T.F.*, 743 N.E.2d 766, 776 (Ind. Ct. App. 2001) (concluding parental rights may be terminated when parties are unable or unwilling to meet their responsibilities), *trans. denied*.

[21] Father also alleges he has continued to work toward reunification through local services since being deported to the Dominican Republic. But we view this argument as nothing more than an invitation to reweigh the evidence as it is well within the juvenile court's discretion to "disregard the efforts [a parent] made only shortly before termination and to weigh more heavily [a parent's] history of conduct prior to those efforts." *K.T.K. v. Indiana Dep't of Child Servs.*, 989 N.E.2d 1225, 1234 (Ind. 2013).

[22] Despite evidence of substance abuse, anger, aggression, a propensity for domestic violence, and an overall lack of parenting skills, Father has failed to take substantial steps to remedy these conditions. Therefore, we conclude the record clearly and convincingly supports the juvenile court's conclusion that the conditions resulting in the Children's removal are unlikely to be remedied.[3]

## B. Best Interests

[23] Next, Father contends the State did not establish by clear and convincing evidence that involuntary termination of his parental rights was in the Children's best interests as required by Indiana Code section 31-35-2-4(b)(2)(C). Specifically, Father argues that "[i]n light of recent case law," the State failed to demonstrate termination was in the Children's best interest because "there

---

[3] Father also contends the State failed to present clear and convincing evidence that the continuation of the parent-child relationship poses a threat to the Children's well-being. Because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, however, we need not address Father's argument. *See In re I.A.,* 903 N.E.2d 146, 153 (Ind. Ct. App. 2009).

remain options short of termination, including continued wardship under the CHINS matter, ongoing services under the supervision of Dominican authorities, and ultimate reunification with Father." Brief of Appellant at 26.

[24] In determining the best interests of a child, the juvenile court evaluates the totality of the evidence and need not wait until the child is "irreversibly harmed" before terminating parental rights. *A.D.S. v. Indiana Dep't of Child Servs.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. In addition to evidence that the conditions that led to a child's removal will not be remedied, a case manager and child advocate's recommendation to terminate the parent-child relationship is sufficient to prove by clear and convincing evidence that termination of parental rights is in the child's best interests. *Id*. at 1158-59. Furthermore, we have held that a parent's non-remedied substance abuse and domestic violence issues alone are sufficient to support a juvenile court's conclusion that termination of parental rights is in the child's best interests although permanency is a "central consideration" in determining a child's best interests. *Id*. at 1159 (internal quotation omitted).

[25] Here, the State presented evidence that after visitations with Father, the Children displayed signs of trauma and their behavior worsened. The guardian ad litem testified that termination is in the Children's best interests. Father has not seen the Children in well over a year since being deported, and instability has had a further traumatic effect on the Children. The Children's therapist believes the stability of their current placement has had a positive effect on the Children and that "they are in need of a forever home sooner than later."

Appellant's App., Vol. II at 26, ¶ 28. The juvenile court also found that "another move for the [C]hildren could be devastating." *Id*. at ¶ 32.

[26] On appeal, Father relies on three cases, *In re J.M.*, 908 N.E.2d 191 (Ind. 2009); *In re G.Y.*, 904 N.E.2d 1257 (Ind. 2009); and *H.G. v. Ind. Dep't of Child Servs.*, 959 N.E.2d 272 (Ind. Ct. App. 2011), *trans. denied,* in support of his argument that the State failed to demonstrate termination was in the Children's best interests. However, aside from describing the facts of these cases, Father never makes a cogent argument as to why they are applicable here. In any event, all three cases involve substantial improvement on the part of the parent—a fact not present here. *See In re J.M.*, 908 N.E.2d at 195 (noting "parents have fully cooperated with the services required of them while incarcerated"); *In re G.Y.*, 904 N.E.2d at 1263 (noting "the record shows that Mother took positive steps and made a good-faith effort to better herself as a person and as a parent"); and *H.G.*, 959 N.E.2d at 292 (noting the "record also shows improvements in H.H.G.'s parenting"). Thus, we believe Father's reliance on those cases is misplaced, and the record presents clear and convincing evidence that termination is in the Children's best interests.

## C. Satisfactory Plan

[27] Father next argues the State failed to present clear and convincing evidence that adoption is a satisfactory plan for the Children pursuant to Indiana Code section 31-35-2-4(b)(2)(D). The juvenile court concluded that "[t]here exists a satisfactory plan for the future care and treatment of the [C]hildren, that being

adoption." Appellant's App., Vol. II at 26, ¶ 35. The permanency plan is for the Children to be adopted by their great-aunt, with whom their grandmother also resides, and the great-aunt has been taking parenting classes to better deal with the Children's special needs.

[28] Father argues the "the facts here simply do not warrant the 'extreme measure' of termination under the law outlined above." Br. of Appellant at 28. However, Father's argument is merely cumulative of those presented above, and, just as those arguments failed, so too must this.

# III. Due Process

[29] Finally, Father argues the termination hearing was not fundamentally fair. Specifically, Father complains that his telephone connection with the hearing was repeatedly disrupted, his counsel failed to object to hearsay testimony or the admission of exhibits, and his counsel failed to call any witnesses on his behalf. As an example of what he contends was his counsel's poor presentation of his case, Father points to the fact that his own testimony constituted only four pages out of the 136-page transcript.

[30] In termination proceedings, parents have certain due process rights and the proceeding must adhere to the requirements of the due process clause. *Santosky v. Kramer*, 455 U.S. 745, 747 (1982). Although due process has never been precisely defined, the phrase embodies a requirement of "fundamental fairness." *In re D.P.*, 27 N.E.3d 1162, 1166 (Ind. Ct. App. 2015). In termination proceedings, due process turns on a balancing of three factors: (1)

the private interests affected by the proceeding, (2) the risk of error created by the State's chosen procedure, and (3) the countervailing governmental interest supporting use of the challenged procedure. *A.P. v. Porter Cty. Office of Family & Children*, 734 N.E.2d 1107, 1112 (Ind. Ct. App. 2000).

[31] Father's claims regarding fundamental fairness deal almost exclusively with the performance of his counsel. Earlier opinions from this court measured counsel's performance using the two-part *Strickland* test applicable in criminal cases. *Baker v. Marion Cty. Office of Family & Children*, 810 N.E.2d 1035, 1039 (Ind. 2004). However, in *Baker*, our supreme court discussed the proper analysis of a claim of ineffective assistance of counsel at a termination hearing as follows:

> Where parents whose rights were terminated upon trial claim on appeal that their lawyer underperformed, we deem the focus of the inquiry to be whether it appears that the parents received a fundamentally fair trial whose facts demonstrate an accurate determination. The question is not whether the lawyer might have objected to this or that, but whether the lawyer's overall performance was so defective that the appellate court cannot say with confidence that the conditions leading to the removal of the children from parental care are unlikely to be remedied and that termination is in the child's best interest.

*Id.* at 1041 (footnote omitted). Therefore, to determine whether Father's hearing was fundamentally unfair because he received ineffective assistance of counsel, we do not focus on the particular actions of counsel, but whether counsel's performance was so defective as to undermine our confidence in the

juvenile court's termination decision. *In re A.P.*, 882 N.E.2d 799, 808 (Ind. Ct. App. 2008) (holding counsel did not provide ineffective assistance where parent received a fundamentally fair trial because the facts demonstrated an accurate determination and the court could say with confidence that DCS adequately proved its case). To conduct such a review, we "must also examine the evidence supporting the termination of his parental rights." *Id.* at 806.

[32] As concluded above, the State proved by clear and convincing evidence that the conditions resulting in the Children's removal will not be remedied,[4] termination was in the Children's best interests, and there exists a satisfactory plan for adoption. As such, we conclude the "facts demonstrate an accurate determination[,]" *Baker*, 810 N.E.2d at 1041, sufficient to overcome a challenge to the effectiveness of counsel. In the interest of thoroughness, however, we endeavor to address each of Father's contentions.

[33] We turn first to Father's argument that he was deprived of a fair hearing because his telephone connection was repeatedly disconnected. The record reflects Father's telephone connection was disconnected on several occasions and that, as a result, Father was unable to hear substantial portions of the State's testimony or the admission of numerous exhibits. Besides ample citations to the record, however, Father fails to advance a cogent argument or

---

[4] Again, because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, we needed not address Father's argument regarding whether a continuation of the parent-child relationship posed a threat to the well-being of the Children. *See supra*, ¶ 22, n.2.

provide citation to authority explaining why these facts rendered Father's proceeding fundamentally unfair. *See* Ind. Appellate Rule 46(A)(8) (providing that the argument section of the appellants brief must "contain the contentions of the appellant on the issues presented, supported by cogent reasoning[,]" along with citations to the authorities, statutes, and parts of the record relied upon, and a clear showing of how the issues and contentions in support thereof relate to the particular facts under review). Therefore, Father has waived this argument on appeal. *D.H. by A.M.J. v. Whipple*, 103 N.E.3d 1119, 1127 (Ind. Ct. App. 2018).

[34] Waiver notwithstanding, the record shows the juvenile court made numerous attempts to accommodate Father's presence at the hearing, Father was provided with an interpreter, Father's counsel was present throughout, and Father was able to testify on his own behalf. A parent does not necessarily have a constitutional right to be present at a termination hearing. *See In re E.E.*, 853 N.E.2d 1037, 1044 (Ind. Ct. App. 2006) (determining that the trial court did not deprive a parent of due process by proceeding with a termination hearing in the parent's absence where the parent's counsel participated in the hearing), *trans. denied*. Under these circumstances and with a lack of cogent argument to the contrary, we cannot conclude repeated disconnections rendered Father's termination proceedings fundamentally unfair.

[35] Second, Father claims his counsel "permitted a number of witnesses to provide testimony adverse to Father without interposing possible foundational or hearsay objections." Br. of Appellant at 21. In support thereof, Father lists

three brief examples of the State's testimony which he claims should have been contested on the basis of hearsay. Father is correct in that the Rules of Evidence regulating the admission of hearsay are applicable in a termination proceeding. *See D.B.M. v. Indiana Dep't of Child Servs.*, 20 N.E.3d 174, 178-80 (Ind. Ct. App. 2014) (discussing applicability of hearsay rules in a termination proceeding), *trans. denied.* However, even if the examples that Father provides constitute inadmissible hearsay, they are either cumulative of other evidence or are unlikely to have contributed to the juvenile court's judgment. *B.H. v. Indiana Dep't of Child Servs.*, 989 N.E.2d 355, 363 (Ind. Ct. App. 2013) (noting that an error is harmless if a judgment is supported by independent evidence such that there is no substantial likelihood that the questioned evidence contributed to the judgment).

[36] Father also argues the State offered a total of sixty-seven exhibits which went unchallenged by his counsel. According to Father, Exhibits 1-27 were produced by the juvenile court in the underlying CHINS case and "many of those documents may have contained hearsay or other unfounded evidence[,]" and Exhibits 28-67 were documentation from service referrals, "many of which contained narratives and other material that would have been objectionable on foundational or other grounds." Br. of Appellant at 22. It is possible that the documents did indeed contain hearsay. However, there are a number of exceptions to the inadmissibility of hearsay evidence, including the business records and public records exceptions, which may apply to CHINS reports and filings. *See D.B.M.*, 20 N.E.3d at 179-80 (citing Indiana Evidence Rules 803(6)

and 803(8)). Furthermore, Indiana Rule of Evidence 201 permits courts to take judicial notice of "records of a court of this state[.]" In light of these exceptions, and Father's failure to provide specific examples of inadmissible hearsay, it is unclear what result, if any, such objections would have obtained.

[37] Finally, Father argues that counsel was ineffective for failing to elicit specific testimony about his recent engagement in services or his housing or employment situation in the Dominican Republic. The record reflects that Father testified regarding the services he planned to begin—a fact reflected in the juvenile court's findings. Appellant's App., Vol. II at 25, ¶ 24 ("[Father] testified he was still planning to start services to address his aggression the Saturday after trial in this matter."). As discussed above however, a juvenile court is at liberty to disregard efforts made only shortly before termination. *See id.* at ¶ 21; *K.T.K.*, 989 N.E.2d at 1234. Thus, again, it is unclear what effect, if any, Father's additional testimony would have had on the result.

[38] For the reasons outlined above, we can say with confidence the record demonstrates an accurate determination that the conditions leading to the Children's removal or the reasons for placement outside the home of Father are unlikely to be remedied and that termination of Father's parental rights is in the Children's best interests. Accordingly, we conclude Father's counsel was not ineffective and Father received a fundamentally fair hearing. *Baker*, 810 N.E.2d at 1041.

# Conclusion

[39] The juvenile court's decision to terminate Father's parental rights was not clearly erroneous and Father received a fundamentally fair hearing. Therefore, we affirm.

[40] Affirmed.

Baker, J., and May, J., concur.